STATE of Wisconsin, Plaintiff-Respondent,

v.

Randall S. BALDWIN, Defendant-Appellant. [Case No. 96–1013–CR]†

STATE of Wisconsin, Plaintiff-Respondent,

v.

Gregory A. BUSCH, Defendant-Appellant. [Case No. 96–2822]††

Court of Appeals

*Nos. 96–1013–CR, 96–2822. Submitted on briefs April 29, 1997.—Decided July 2, 1997.*

(Also reported in 569 N.W.2d 37.)

†Petition to review denied.
††Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher A. Mutschler* and *Michele A. Tjader* of the *Law Offices of Barry S. Cohen, S.C.* of Elkhart Lake.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Robert J. Wells*, District Attorney and *Joseph DeCecco,* Assistant District Attorney.

Before Brown, Nettesheim and Anderson, JJ.

ANDERSON J. Randall S. Baldwin and Gregory A. Busch claim that the trial court erred in failing to

suppress the breath test results from an untested, unevaluated and unapproved Intoxilyzer Model 5000, Series 6400. We reverse Busch's conviction for operating a motor vehicle while having a prohibited alcohol concentration (OMVPAC) because the automatic admissibility and the prima facie presumption of accuracy of breath test results are directly tied to the evaluation and approval of the breath testing instrument by the chief of the Department of Transportation's chemical testing section. Here, the failure to comply with the mandates of the state statutes and the administrative code calls into question the accuracy of the instrument used to test Busch's breath. However, Busch is not entitled to the suppression of the breath test results upon remand of his appeal; rather, a new trial is required where the State will not have the benefit of automatic admissibility or the prima facie presumption of accuracy.

We affirm Baldwin's conviction for operating a motor vehicle while intoxicated (OMVWI). Although the breath test results are relevant to the conviction, he fails to argue that there is no evidence that supports his conviction for OMVWI.

Baldwin was arrested for a second offense OMVWI in violation of §§ 346.63(1)(a) and 346.65(2)(b), STATS.,[1] and a second offense OMVPAC in violation of §§ 346.63(1)(b) and 346.65(2)(b). Busch was arrested for his first offense OMVWI, § 346.63(1)(a) and his first offense OMVPAC, § 346.63(1)(b). They brought separate motions to suppress their respective breath test results on the grounds that the instrument used to test their breath had not been evaluated and approved as

---

[1] Sections 346.63(1)(a) and 346.65(2)(b), STATS., have been amended by 1995 Wis Act 448, § 371 and 1995 Wis Act 425, § 11, respectively. These changes do not affect our analysis.

required by § 343.305(6)(b), STATS., and WIS. ADM. CODE § TRANS 311.04.

In Baldwin's case, an evidentiary hearing was conducted and after argument of the parties, the trial court concluded that the modifications to the instrument did not change the analytical process and that evaluation and approval of the instrument prior to use were not required under the administrative rule. A jury subsequently convicted Baldwin of both counts and the trial court entered a judgment of conviction on the second offense OMVWI. He commenced this appeal limited to the issue of whether the breath test instrument had been properly evaluated and approved and seeking suppression of the breath test results.

In Busch's case, the prosecution and defense stipulated to incorporate by reference the testimony and argument presented in Baldwin's case, and the trial court denied the motion for the reasons it gave in the Baldwin case. After brief testimony on the underlying offense, the court found Busch guilty of both counts and entered a judgment of conviction on the first offense OMVPAC. In this appeal he seeks the same relief as requested by Baldwin.[2]

The only witness at Baldwin's evidentiary hearing was George Menart. Menart testified that for thirteen years he has been a senior electronics technician for the Wisconsin State Patrol chemical testing section and that he is responsible for running the statewide service program for breath testing instruments. According to Menart, in 1983 and 1984 he was involved

[2] Upon motion by the State, these two cases were consolidated for the purposes of appeal. Because the issue raised merits a decision by a three-member panel and publication, the Chief Judge issued an order changing this appeal to a three-judge appeal pursuant to RULE 809.41(3), STATS. .

in the testing and evaluation of breath testing instruments to replace the then existing Breathalyzer; as a result of this program, the State purchased the Intoxilyzer Model 5000, Series 6400.[3]

In the last twelve years, major modifications have been made to the internal components of the Intoxilyzer Model 5000, Series 6400 used to analyze Baldwin's and Busch's breath samples. The modifications were required either because of obsolescence or existing components wearing out.[4] The modifications have been made by replacing components of the Series 6400 with components designed for the Intoxilyzer Model 5000, Series 6600.[5]

The changes made to the Intoxilyzer Model 5000, Series 6400 used to administer the breath test to Baldwin and Busch included: (1) replacement of the processor boards with Series 6600 processor boards that incorporated additional circuitry for an internal

---

[3] By early 1986, the State had replaced all Breathalyzers with the Intoxilyzer Model 5000, Series 6400. *See* Patricia H. Field, Ph. D., *Alcohol and Other Drugs in Wisconsin Drivers: The Laboratory Perspective,* 69 MARQ. L. REV. 235, 239 n.30 (1986).

[4] According to one article the life span of breath alcohol testing equipment is approximately eight to ten years due to improving technology and material sciences. Gil Sapir & Mark Giangrande, *Predominantly Popular, Patently Practical Patents in Breath Alcohol Testing,* CHAMPION, Nov. 1996, at 38, 38.

[5] Menart testified that there is no money to replace the Intoxilyzer Model 5000, Series 6400, and in localities where the instrument is used a lot "it's getting to the point where the boards are getting so old that it just makes more sense to put in a new board as a stopgap measure to keep that equipment going until we can get money for new equipment."

calibration standard not used in Wisconsin;[6] (2) replacement of the mother board with the Series 6600 mother board that includes circuitry to keep the sample chamber at a specific temperature—in the Series 6400 the heater for the sample chamber was mounted externally under the chamber;[7] (3) replacement of power supply; (4) upgrade of the memory from 16 kilobytes to 32 kilobytes; (5) installation of a phone-activated timer that permits the Department of Transportation to access the memory of the Intoxilyzer Model 5000, Series 6400; (6) installation of a 10,000 ohm resistor to bleed a capacitor so that service personnel would not receive an electrical shock; and (7) the diodes, capacitors, resistors, transistors and chips on the replacement Series 6600 mother boards are not from the same manufacturer as those on the Series 6400 mother boards; but they do meet the original specifications established by the manufacturer for the Series 6400.

During cross-examination, Menart described the optical bench—which includes the sample chamber, the lenses, the infrared source, and the detector—and explained how the machine processes multiple signals are identical between the two series.[8] According to

---

[6] Menart testified that the processor board "does the detection and the processing of the analogue signals off the sample chamber . . . ."

[7] The mother board is a "system to plug all the other electronics into. Essentially what it is is it provides a means of getting data transferred back and forth between the different systems, addressing for the computer to go to a specific location, and, also, provide and distribute power."

[8] The Intoxilyzer Model 5000 is a "dry" breath testing instrument that uses infrared radiation in analyzing breath samples.

Menart, the integrated circuits are identical, as are the values of the capacitors and resistors. Also, according to Menart, the Series 6600 is considered to be the same machine as the Series 6400; however, he testified that the Intoxilyzer Model 5000, Series 6600 has never been evaluated.

In the trial court, Baldwin and Busch argued that the breath test instrument used to analyze their breath

The dry devices, unlike the wet devices, do not use chemicals. Dry devices instead use infrared spectroscopy, a process which identifies a chemical compound by identifying the infrared radiation wave lengths that the chemical absorbs. A dry device has four main parts: an air sample collection device, two gas chambers, a quartziodide light bulb and a detector cell. The gas chambers function similarly to the ampoules in the wet device. One chamber collects a sample of the suspect's breath, while the other chamber contains a sample of ordinary air as a control sample.

Once the air samples have been collected, the quartziodide light beams infrared radiation into both samples. The alcohol in the suspect's breath sample absorbs infrared radiation with a wavelength of 3.39 microns. The absorption of infrared radiation causes less energy to reach the detector cell in the sample chamber than in the control chamber. This difference in the energy detected is then converted into a percent of blood alcohol content using the Beer-Lambert Law. The greater the alcohol content of the breath, the greater the difference in energy levels detected by the two detectors. Consequently, a higher blood alcohol content will be recorded.

Both wet [Breathalyzer] and dry devices are able to determine a blood alcohol level from the amount of alcohol present in a suspect's breath by using the principle known as Henry's Law. Henry's Law states that "at constant temperature, the concentration of a gas dissolved in a liquid is proportional to the concentration of that same gas in air directly above that liquid." Breath testing devices apply Henry's Law to a sample of air from the suspect's alveoli, the small air sacs in the lungs where oxygen is transferred to the blood and where blood can pass alcohol into the suspect's breath.

Paul Schop, Comment, *Is DWI DOA?: Admissibility of Breath Testing Evidence in the Wake of Recent Challenges to Breath Testing Devices*, 20 Sw. U. L. Rev. 247, 255–56 (1991) (footnotes omitted).

samples—either the hybrid instrument or the Series 6600—had never been evaluated and approved as required by the administrative code. Both sought suppression of the breath test results because they were from "untested, nonevaluated machine[s]." The State responded that although the Series 6400 has been upgraded with components from the Series 6600, there was no need to test the latter because there was no difference in the analysis performed either by the hybrid testing instrument or the Series 6600.

The trial court denied Baldwin's and Busch's motions concluding that the underlying analytical process had not been upgraded and that there was no need to evaluate and approve the Series 6600 or the hybrid instrument because the analytical process was identical to the process employed by the Series 6400. The trial court concluded that expert testimony was required to establish significant differences between the machines that effected the analytical process. The court held that the agency met its responsibilities under the administrative code when it determined that additional testing was not required. The court accepted that the breath test instrument, used to analyze Baldwin's and Busch's breath samples, was "appropriately tested and in compliance with both state statutes and the administrative code."

We need not address Baldwin's assertions. The jury found him guilty of both OMVWI and OMVPAC; however, the trial court entered the judgment of conviction only on the OMVWI verdict. Even if the result of his breath test is suppressed, the judgment convicting him of OMVWI remains. Though the result of Baldwin's breath test is relevant evidence to determine whether he is guilty of OMVWI, he has not argued that

in the absence of the breath test result, the remaining evidence is insufficient to support a conviction for OMVWI. *See State v. Burkman*, 96 Wis. 2d 630, 642–43, 292 N.W.2d 641, 647 (1980). We generally do not decide issues not raised on appeal. *See Waushara County v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16, 19 (1992).

Busch renews his argument on appeal. He contends that WIS. ADM. CODE § TRANS 311.04 is mandatory and requires the testing of all breath testing instruments used in Wisconsin. According to his argument, the perspective that the Series 6600 is the same machine as the Series 6400 is not the equivalent of the evaluation mandated by the administrative code. The State responds that although Series 6600 components have been used to replace Series 6400 components because of updated technology and obsolescence, the operational concepts have not been compromised. The State insists that the updating of the Series 6400 does not warrant evaluation of the hybrid instrument or the Series 6600.

The parties do not dispute that seven major modifications have been made to the Series 6400; they do not dispute that components from the Series 6600 have been used to replace Series 6400 components; and, they do not dispute that the Series 6600 has never been evaluated or approved for use in the State of Wisconsin. The only dispute Busch and the State have is whether the implied consent statutory scheme requires the evaluation and approval of the Intoxilyzer Model 5000, Series 6600. Therefore, this appeal requires us to apply § 343.305(6)(b), STATS., and WIS. ADM. CODE § TRANS 311.04 to undisputed facts. The application of statutes and administrative rules to undisputed facts

254

involves a question of law and we need not defer to the conclusions of the trial court. *See Dorschner v. DOT*, 183 Wis. 2d 236, 239, 515 N.W.2d 311, 312 (Ct. App. 1994).

An administrative rule cannot be applied in isolation. *See McGarrity v. Welch Plumbing Co.*, 104 Wis. 2d 414, 427, 312 N.W.2d 37, 43 (1981). If it is part of a comprehensive statutory and regulatory scheme, it must be applied in conjunction with its companion statutes and rules. *See Sommerfield v. Sommerfield*, 154 Wis. 2d 840, 847, 454 N.W.2d 55, 58 (Ct. App. 1990). Because WIS. ADM. CODE § TRANS 311.04 is obviously an integral part of the implied consent law, we will consider the statutes and the public policy considerations behind the statutory scheme to remove drunk drivers from the highways.

Section 343.305(6)(b), STATS., is part of Wisconsin's statutory scheme of detecting, arresting, prosecuting and punishing drunk drivers and establishes the standards for performing breath tests. The statute requires the Department of Transportation to approve techniques or methods of performing chemical analysis of the breath and to "test and certify the accuracy of the equipment to be used by law enforcement officers for chemical analysis of a person's breath under sub. (3) (a) or (am) *before regular use* of the equipment." Section 343.305(6)(b)3, STATS. (Emphasis added.)

To assist the Department of Transportation in the administration of its mandated duties under § 343.305(6)(b), STATS., chapter 311 of the administrative code was created in 1985. *See* WIS. ADM. CODE § TRANS 311.01. The section of those administrative

rules applicable to breath test instruments is WIS. ADM. CODE § TRANS 311.04 (1993):[9]

**Approval of breath alcohol test instruments.** **(1)** Only instruments and ancillary equipment approved by the chief of the chemical test section may be used for the qualitative or quantitative analysis of alcohol in the breath.

**(2)** (a) All models of breath testing instruments and ancillary equipment used shall be evaluated by the chief of the chemical test section.

(b) The procedure for evaluation shall be determined by the chief of the chemical test section.

**(3)** Each type or category of instrument shall be approved by the chief of the chemical test section prior to use in this state.

**Note**: The following quantitative breath alcohol test instruments are approved for use in Wisconsin:

Intoxilyzer Model 5000

Intoxilyzer Model 1400

Intoxilyzer 5000 Model 000568

. . . .

Busch is not attacking the accuracy with which the analysis of his breath samples was performed. Rather, he has leapfrogged to an attack on the integrity of the hybrid breath testing instrument used to analyze breath samples. He reads the administrative code as mandating the evaluation and approval of any quanti-

---

[9] The note to WIS. ADM. CODE § TRANS. 311.04 was amended in May 1997. The amended note provides: "A current list of calibrating units that have been approved for use in the State of Wisconsin is available from the Chemical Test Section, Wisconsin State Patrol . . . ." All references are to the previous version which became effective Feb. 1, 1993.

tative breath test instrument before it is used in Wisconsin. We understand the gist of his argument to be that the failure to evaluate and approve either the Intoxilyzer Model 5000, Series 6600 or the hybrid calls into question the presumption of accuracy accorded tests by recognized scientific methods. *See State v. Trailer Serv., Inc.*, 61 Wis. 2d 400, 408, 212 N.W.2d 683, 688 (1973). We agree.

When we were confronted with a challenge to § 343.305(6)(c), STATS., concerning the steps that must be followed in administering a breath test with an infrared instrument, we held:

> We conclude that "shall" is mandatory. It is reasonable to interpret the statute's objective to insure an accurate and reliable test. The chemical test procedures are mechanical in nature and consequently, intoxilyzer test results are entitled to automatic admissibility and to a *prima facie* presumption of accuracy to establish the defendant's blood alcohol level. We read the mandatory nature of the statute as the legislative *quid pro quo* for a driver's implied consent to testing for BAC. Furthermore, the reliance on the mechanical nature of the test and the justification for the automatic admissibility provision are severely undermined if the section is not given a mandatory reading. If the requirements of sec. 343.305(6)(c), Stats., are not strictly met, then the assurance of accuracy is no longer present.

*State v. Grade*, 165 Wis. 2d 143, 148–49, 477 N.W.2d 315, 317 (Ct. App. 1991) (citations omitted).

■

Our rationale, implicit in *Grade*, is easily put to use in this appeal. The rationale starts with

§ 343.305(5)(d), STATS.,[10] which incorporates § 885.235, STATS.,[11] and makes the result of a breath test admissible at a trial. In Wisconsin, "[a] chemical test specified by statute may not be deemed unreliable as a matter of law." *City of Madison v. Bardwell*, 83 Wis. 2d 891, 900, 266 N.W.2d 618, 622 (1978). The supreme court has made it clear that after *Bardwell*, state-recognized tests of breath samples are entitled to a prima facie presumption of accuracy. *See State v. Disch*, 119 Wis. 2d 461, 475, 351 N.W.2d 492, 499 (1984). The rulings in *Bardwell* and *Disch* flow from *Trailer Service*, 61 Wis. 2d at 407–08, 212 N.W.2d at 688–89, where the supreme court held:

> [A] method or process for testing which is expressly authorized by statute is entitled to a prima facie presumption of correctness of purpose. In such a case, all that needs to be proved is that the method was followed. A scientific or medical method not recognized as acceptable in the scientific or medical discipline as accurate does not enjoy the presumption of accuracy, i.e., lie-detector tests. But tests by recognized methods need not be proved for reliability in every case of violation. Examples, speedometer, breathalyzer, radar. These methods of measurement carry a prima facie presumption of accuracy. Whether the test was properly conducted or the instruments used were in good working order

---

[10] Section 343.305(5)(d), STATS., has been amended by 1995 Wis. Act 436, § 16 and 1995 Wis. Act 448, § 352. The changes do not affect our analysis.

[11] Numerous legislative changes have been made to various provisions in § 885.235, STATS. *See* 1995 Wis. Act 436, §§ 28–36 and 1995 Wis. Act 448, §§ 402–405. These changes clarify the admissibility of breath test results and do not alter our rationale.

is a matter of defense. The administration of law would be seriously frustrated if the validity of basic and everyday accepted tests had to be a matter of evidence in every case in the first instance. [Citations omitted.]

In *State v. Dwinell*, 119 Wis. 2d 305, 349 N.W.2d 739 (Ct. App. 1984), we had occasion to address whether a breath test instrument evaluated and approved by the department under the predecessors to § 343.305(6)(b), STATS., and WIS. ADM. CODE § TRANS 311.04 was entitled to the prima facie presumption of accuracy. Dwinell challenged his drunk driving conviction on the theory that the trial court erred in admitting breath test results from the Intoximeter 3000 without requiring the prosecution to demonstrate the reliability of the device.[12] *Dwinell*, 119 Wis. 2d at 308, 349 N.W.2d at 741. Relying, in part, on *Trailer Service* and *Bardwell*, we upheld Dwinell's conviction:

Because the Department of Transportation has approved the Intoximeter 3000 as an acceptable device for quantitatively analyzing a driver's breath, we will not overturn the trial court's determination allowing the results of the test into evidence. The expertise of the Department as to the wisdom of its rules and regulations should be respected by this court in this case. The Intoximeter 3000 has met the requirements established by the Department and, therefore, is accorded the presumption of accuracy given to the other breath-testing devices listed in the Wisconsin Administrative Code. This presumption allows the results of breath tests obtained by the Intoximeter 3000 to be

---

[12] The Intoximeter 3000 was a "dry" type of breath alcohol test instrument, *see* Schop, *supra* note 8, at 253, that went out of production in 1994. *See* Sapir & Giangrande, *supra* note 4, at 38.

allowed into evidence without testimony regarding the machine's scientific accuracy and reliability.

*Dwinell,* 119 Wis. 2d at 310, 349 N.W.2d at 739.

■

The evaluation and approval of the breath test instrument are the prerequisites to clothing the instrument with a presumption of accuracy. Without the testing of the instrument by the chief of the chemical testing section, there is no certification that the instrument and its analysis method are recognized as acceptable and accurate. Just as strict adherence to the statutorily required testing sequence is part of the quid pro quo for a driver's implied consent, so too is the requirement that before regular use a breath testing instrument must be evaluated and approved as acceptable.

The evaluation and approval before regular use of any breath testing instrument also simplify the state policy of facilitating the taking of tests for intoxication and removing drunken drivers from the highway. *See Scales v. State,* 64 Wis. 2d 485, 494, 219 N.W.2d 286, 292 (1974). A properly evaluated and approved instrument relieves prosecutors from presenting evidence of the instrument's scientific accuracy and reliability in each prosecution; they do not have to waste precious resources to affirmatively prove compliance with accepted scientific methods as a foundation for the admission of the test results. With the accuracy of the breath test results presumed, the burden is now shifted to those defendants who choose to challenge the reliability or accuracy of the results.

■

It is not enough that the department's "perspective" is that the Model 6400, Model 6600 and the hybrid machine are the same. The statute and the administra-

tive code do not allow for approval based upon "perspective." Although we do give great weight to an administrative agency's interpretation and application of its own rules, *see State ex rel. Durando v. State Athletic Comm'n,* 272 Wis. 191, 195, 75 N.W.2d 451, 453 (1956), we do require the agency to follow its own rules made in conformity with an enabling statute. *See State ex rel. Anderson-EL II v. Shade,* 181 Wis. 2d 348, 353, 510 N.W.2d 805, 807 (Ct. App. 1993). The rule requires that before an instrument is approved for regular use in the state, the chief of the chemical testing section will fully evaluate the instrument to verify that it employs an analysis or method recognized as accurate by a scientific discipline and will produce reliable results. It is conceded by the State that it never evaluated or verified that the Series 6600 instrument met these goals; and, more importantly, that the approved Series 6400 instrument, after modification with untested components from the Series 6600, continued to meet these goals.

We do not read the rule requiring preuse evaluation and approval as preventing replacement of components from the same machine. Replacement of obsolete or worn-out Series 6400 components with new components specifically designed for that instrument would not require evaluation and approval because the instrument has already been certified as operating by a scientific method recognized as accurate and reliable. We do read the rule as requiring that before any new quantitative breath testing instrument is put into regular use, it must be evaluated and approved as using scientific methods recognized as accurate and reliable. We also read the rule as requiring evaluation and approval when existing instruments are retrofitted with components that have never been evaluated or

approved. The evaluation and approval of breath testing instruments before regular use are necessary to accord to the instrument the prima facie presumption of accuracy and automatic admissibility given to the other breath testing devices listed in WIS. ADM. CODE § TRANS 311.04. This presumption authorizes the results of breath tests obtained by an instrument to be allowed into evidence without foundation evidence regarding the machine's scientific accuracy and reliability. *See Dwinell*, 119 Wis. 2d at 310, 349 N.W.2d at 742.

It is not enough that the list of approved quantitative breath testing instruments in WIS. ADM. CODE § TRANS 311.04 includes the Intoxilyzer Model 5000. First, Menart testified that the Series 6600 was not available for testing in 1983 or 1984; therefore, it is obvious that the Series 6600 could not be part of the Intoxilyzer Model 5000 that was evaluated and approved in 1983 or 1984. Second, the administrative code also lists the Intoxilyzer Model 5000 Model 000568; the listing of a different model of this instrument leads to the conclusion that this is a comprehensive listing and if an instrument, such as the Series 6600, is not specifically listed, it is intentionally excluded from the approved list.[13] Third, the fact that the only quantitative breath testing instruments

---

[13] The manufacturer of the Intoxilyzer Model 5000 has several models in addition to the Series 6400 and Series 6600. The Intoxilyzer Model 5000/568G, evaluated and approved in Wisconsin, has been replaced by the Intoxilyzer Model 5000/768 "in response to increased evidential demands in breath alcohol testing." Sapir & Giangrande, *supra,* note 4, at 38. The author of this article contends that "[e]ach breath alcohol machine is unique" making it important to know the correct make and model of the instrument. *See id* at 39.

listed in the rule are those that were evaluated and approved under the auspices of the enabling statute leads to the conclusion that this is an exclusive list limited to the instruments actually evaluated. *Cf. Dziadosz v. Zirneski,* 177 Wis. 2d 59, 63, 501 N.W.2d 828, 830 (Ct. App. 1993) (" 'the legislature would [not] have taken pains to specifically refer to particular statutes . . . if it intended to incorporate . . . other miscellaneous general provisions' ") (quoted source omitted).

Busch argues that the remedy for using an instrument that has not been evaluated and approved is suppression of the test results. Busch's argument is limited to one sentence in his brief, and we could decline to review his broadly stated argument that is unsupported by any legal reasoning. *See Fritz v. McGrath,* 146 Wis. 2d 681, 686, 431 N.W.2d 751, 753 (Ct. App. 1988). In spite of that, we will address the proper remedy because we are remanding for a new trial and the trial court and the parties will need guidance on how to deal with Busch's breath test results.

It is now well settled that noncompliance with the procedures set forth in the implied consent law "does not render chemical test evidence otherwise constitutionally obtained inadmissible." *See State v. Zielke,* 137 Wis. 2d 39, 41, 403 N.W.2d 427, 428 (1987). Busch does not argue that his breath sample was obtained by unconstitutional means. His entire appeal is premised on the question of whether the State complied with the mandatory procedural requirements for the evaluation and approval of quantitative breath test instruments before regular use.

We have earlier held that preuse evaluation and approval are threshold requirements for automatic

admissibility; we now hold that where test results are obtained using an instrument not evaluated and approved as required in § 343.305(6)(b), STATS., and WIS. ADM. CODE § TRANS 311.04, the results are no longer entitled to automatic admissibility or to a prima facie presumption of accuracy to establish the defendant's blood alcohol level. In such cases, prosecutors who wish to rely upon the breath test results will be required to present evidence of the instrument's scientific accuracy and reliability and prove compliance with accepted scientific methods as a foundation for the admission of the test results.[14]

*By the Court.*—No. 96–1013-CR, judgment affirmed; No. 96–2822, judgment reversed and cause remanded.

[14] Upon remand, the State will be required to present competent evidence that the results of the analysis of Busch's breath sample by the hybrid Intoxilyzer were scientifically accurate and reliable. Menart's previous testimony at the suppression hearing is not sufficient. We do not read Menart's testimony as establishing that when the analysis of Busch's breath was performed by the hybrid Intoxilyzer, the analysis was scientifically accurate and reliable. Rather, Menart's testimony was limited to an attempt to justify why the hybrid Intoxilyzer did not have to be evaluated and approved under WIS. ADM. CODE § TRANS. 311.04.